UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,                Crim. No. 10-20545

v.                                Hon. David M. Lawson

Tyrone Richard Watkins,

        Defendant.

---

## United States' Response to Defendant's Motion for Compassionate Release

---

        In 2011, Judge Cohn sentenced armed bank robber, Tyrone Richard Watkins, to 240 months' imprisonment for robbing five separate banks in five weeks. (R. 21: Judgment, 70). Watkins now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the basis of a generalized fear of contracting Covid-19. (R. 59: Motion, 411, 419). But Watkins does not qualify for compassionate release, so his motion should be denied.

        *First*, he does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot

independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Watkins's medical conditions are simply not extraordinary and compelling. But even if Watkins's potentially heightened risk from Covid-19 based on his hypertension[1] qualified as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n. 1(A), Watkins's commission of five bank robberies culminating in a dangerous high-speed chase, demonstrates that the danger Watkins presents to the to the community, precludes his release under USSG § 1B1.13(2). *See* CDC Risk Factors. For similar reasons, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

*Second*, the Bureau of Prisons has also taken significant steps to protect all inmates, including Watkins, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates

---

[1] On June 25, 2020, the CDC revised its list of risk factors. Hypertension is listed as a condition that *might* increase a person's risk of contracting Covid-19.

face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. These directives have already resulted in thousands of inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 2020 WL 3056217, at *11—the Court should deny Watkins's motion for compassionate release.

## Background Information

Watkins began his crime spree on July 10, 2010, at a bank in southeast Michigan. After entering the bank and displaying a 9 mm semi-automatic pistol tucked into the waistband of his pants, the teller gave the defendant $3,750. Two weeks later, the defendant entered another bank and again lifted his shirt to reveal a firearm in his waistband. As he gripped the handle of the gun, Watkins told the teller, "I want all your hundreds and fifties." Watkins then took approximately $1,000. Two days later, Watkins robbed a third bank. When he approached the victim-teller, he displayed the gun in his waistband. He took $1,250 and fled the scene. On August 9, 2010, Watkins robbed another bank, taking $1,950

after showing a handgun to the teller at the counter. Finally, on August 20, 2010, Watkins pointed a gun at a teller, and stole $2,530. Watkins fled the scene and led police officers on a high-speed chase that nearly caused several accidents. Eventually, Watkins crashed his car in a field near the highway. Inside his car, police found the money Watkins stole from the bank, a Smith and Wesson firearm, and some crack cocaine. His guidelines were a mandatory 107 years in prison, however the party reached a plea with a sentence agreement of 20 years.

Watkins began serving his 240-month sentence in September of 2010. He is incarcerated at FCI Milan, and his projected release date is September 17, 2027. Watkins is 45 years old, and his only underlying medical condition is essential (primary) hypertension, which he treats with oral medication. (Exh. 1, Watkins Medical Records 2019, p. 2, *Sealed*). Nevertheless, Watkins, who admits he is in "good health," has moved for compassionate release, citing his generalized fear of contracting Covid-19, (R. 59: Motion, 415, 419). The Court should deny his motion.

## Argument

### I.   The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A.   The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from

other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal

inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times. This is true at FCI Milan, where Watkins is detained. As of July 8, 2020, there are three inmates who have tested positive for COVID-19. *See* BOP Covid-19 Website. These inmates are quarantined. *Id,*

### B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to

consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Thousands of federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

([03-26-2020 Directive to BOP](); [04-03-2020 Directive to BOP]()). These
criteria account for justifiable concerns about whether inmates "might
have no safe place to go upon release and [might] return to their
criminal activities," as well as "legitimate concerns about public safety."
*Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates
indiscriminately and unleash tens of thousands of convicted criminals,
en masse. *See id.* It must focus on the inmates who have the highest
risk factors for Covid-19 and are least likely to engage in new criminal
activity. This is true not just to protect the public generally, but to avoid
the risk that a released defendant will bring Covid-19 back into the jail
or prison system if he violates his terms of release or is caught
committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C.
§ 60541(g)(2).

The Bureau of Prisons must also balance another important
consideration: how likely is an inmate to abide by the CDC's social-
distancing protocols or other Covid-19-based restrictions on release?
Many inmates—particularly those, like Watkins, who have been
convicted of a serious offense—have already proven unwilling to abide

by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates

who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.  The Court should deny Watkins's motion for compassionate release.

Watkins's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a

district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, a defendant must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Second*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the

defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. There are no extraordinary and compelling reasons to grant Watkins's compassionate release.

While Watkins exhausted his administrative remedies by submitting his request for compassionate release to the warden, granting compassionate release in this circumstance would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18

U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of

the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Watkins and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Watkins's age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. To begin with, Watkins is only 45 years old—20 years younger than the category of "older adults" who are at risk of becoming severely ill if they contract Covid-19. *See* CDC Risk Factors. And, despite his generalized and

unsubstantiated claims of coronary artery disease and increased potassium levels, the only possible medical condition that presents a risk factor for Watkins is hypertension—which he manages with prescription medication. (R. 59: Motion, 419). But hypertension alone, does not render a defendant eligible for compassionate release. "Given the prevalence of the condition, and that it increases with age, it is not possible to conclude from the data available that primary hypertension alone causes a more severe outcome from COVID-19 despite the fact that it is epidemiologically linked to this outcome." Exh. 2, Declaration of Dr. John M. Flack. And not all hypertension is the same. The CDC lists "pulmonary hypertension" as a "serious heart condition" that may place individuals at greater risk. *See* CDC Risk Factors. But Watkins does not have pulmonary hypertension or any reason to believe that his hypertension is more serious than garden-variety high blood pressure. Exh. 3, 2020 Medical Records, 43, *Sealed*. And as Judge Levy recently noted, "at best, the evidence regarding non-pulmonary hypertension is unclear." *Malam, et al v. Alducci*, 20-10829 (E.D. Mich. May 12, 2020), at p. 22.

Moreover, the reduced number of Covid-19 cases currently reported at Milan suggests that Watkins's risk of contracting Covid-19 in BOP custody is quite low. So whether considered alone or in combination with the Covid-19 pandemic, Watkins's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5– *6 (E.D. Mich. May 15, 2020).

Finally, even if the combination of Watkins's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, he would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United*

*States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Undisputedly, Watkins remains a threat to community safety.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Watkins's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). He is not eligible for compassionate release.

## B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must

consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Watkins eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Watkins's bank robberies were not an anomaly, as Watkins would have the Court believe. (R. 59: Motion, 414). This was a five-week crime spree in which Watkins chose recklessly to disregard the lives of people at five separate banks, as well as countless others whom he endangered during his flight from police. Fortunately, no one got hurt. This providential outcome, however, in no way diminishes the gravity of Watkins's dangerous lapse in judgment. Undoubtedly, this is a serious

offense committed by a dangerous man from whom the public still requires protection.

### III.  If the Court were to grant Watkins's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Watkins's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Watkins's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER,
United States Attorney

*s/Eaton P. Brown*
EATON P. BROWN
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9184
E-Mail: eaton.brown@usdoj.gov

Dated:  July 15, 2020

## Certificate of Service

I hereby certify that on July 15, 2020, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system

which will send notification of such filing to all attorneys of record

<div style="margin-left:40%">

*s/Eaton P. Brown*
EATON P. BROWN
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9184
E-Mail: eaton.brown@usdoj.gov

</div>